**UNITED STATES**

v.

**Senior Airman Roberto A. GITTENS, FR151–66–6743 United States Air Force.**

**ACM 29227.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 1 March 1991.

Decided 25 Nov. 1992.

Appellate Counsel for the Appellant: Captain David D. Jividen (argued), Colonel Jeffrey R. Owens, Lieutenant Colonel Terry J. Woodhouse, and Major Mary C. Yastishock.

Appellate Counsel for the United States: Captain Jane M.E. Peterson (argued), Colonel Richard L. Purdon, Lieutenant Colonel Brenda J. Hollis, Lieutenant Colonel Jeffery T. Infelise, Major Paul H. Blackwell, Jr., and Captain James C. Sinwell.

Before DIXON, McLAUTHLIN, and HEIMBURG, Appellate Military Judges.

## OPINION OF THE COURT

HEIMBURG, Judge:

In a contested trial before members, appellant was convicted by a general court-martial of attempted rape.[1] His approved sentence consists of a bad-conduct discharge, confinement for 1 year, and reduction to airman basic. He has assigned seven errors on appeal. Finding none persuasive, we affirm.

### The Factual Sufficiency of the Evidence

Appellant argues the evidence is factually insufficient to sustain the finding of guilty of attempted rape. While the testimony at trial was conflicting and some witnesses appeared unable or unwilling to recall events, we find the evidence sufficient to support conviction.

The charges in this case arose out of a party held in the wee hours of a Sunday morning at the on-base residence of an 18–year–old female dependent, A.H., identified as the victim. Not surprisingly, the victim's parents and siblings were away for the weekend. Testimony indicated that a number of people, most of them male, congregated at the house after the NCO Club closed. Many of those present were playing "quarters," a drinking game in which the winner was privileged to declare who next would down a shot of tequila or "E & J," identified as a brandy.

The victim, who already had consumed some alcoholic drinks that night, joined the "game" briefly and was required to down four shots in rapid succession. She remembered nothing after that until she awoke some time later, face down on her sister's bed, with a "real sharp pain in my behind." She believed there were two voices in the room, but she could identify neither of them. One said, "Hurry up ... because I'm next." The room was dark, with the door closed and no lights on. When she next awoke, it was Sunday afternoon, she was mostly unclothed, felt "dirty," and believed she had had sex with someone. Initially, she did not know what had happened to her, but, after discussing events with others who had been present, decided she had been raped and reported that on Thursday. Although her memory was foggy, she knew she never consented to any sex act.

Given the victim's limited recall of events, the prosecution case depended on the testimony of others. Chief among them was J.W., a close friend of the victim who was present at the house all night.

---

1. Appellant was arraigned on charges of rape, forcible sodomy and adultery (he was married to another person at the time.) The trial judge granted a motion for a finding of Not Guilty to the forcible sodomy charge at the conclusion of the prosecution case.

J.W. testified she was cleaning up in the kitchen after the victim went to a bedroom to lie down. D.H. called her to the bedroom, exclaiming, "I can't believe what they're doing to her." Entering the room, J.W. saw C.L., M.R., and the victim, who was lying on the bed. J.W. believed the men in the room were "trying to mess with her or something," so she went to the kitchen area and asked appellant to "go get those guys out of the room with [the victim]." Appellant went toward the bedroom. Five to ten minutes later, as she was cleaning up the living room, J.W. heard the victim's voice, "screaming at the top of the lungs saying, 'You get off of me. You're hurting me.'" She and D.H. went to the bedroom and found the door closed. She couldn't turn the knob or enter the room. Eventually, when the door opened slightly, she saw the bed was pushed against the door. When she was allowed to enter, appellant was alone with the victim in the room; his pants and underwear were down. He pulled his clothing back on and left the room, saying to J.W., "She's calling for [R.W.]." J.W. saw that the victim was nude from the waist down, with her sweater, bra and tank top pulled up "around her neck." J.W. "covered her up" and shut the door. Shortly, M.R., D.H., C.L. and appellant left the house. J.W. stayed until 0800.

D.H. had been drinking heavily that night. His testimony as to the chronology of events and other details did not match J.W.'s exactly, but he corroborated significant events. He recalled going to get J.W. once with the message that guys were "pulling a train on" the victim. When he and J.W. went to the bedroom, she couldn't get the door open at first, but finally "busted it open" and found appellant in the room with the victim. He thought there were others in the room, but wasn't certain who or how many. He denied seeing appellant "doing anything" of a sexual nature to the victim, even touching her.

M.R., an unwilling witness who had been drinking enough that night to be "intoxicated", corroborated J.W.'s testimony and provided significant admissions by appellant. Very late, "morning or early morning," he was going past a bedroom to the bathroom and heard, "Take it out, it's hurting" spoken twice. He continued to the bathroom. When he returned after five minutes he saw appellant in the hallway, C.L. and D.H. in the bedroom. C.L. was "comforting" the victim. Soon he, C.L., D.H. and appellant went to the car. In the car, C.L. said, "That was pretty messed up what happened," and "Bobby [appellant] said that he had got some" and spoke about pushing the bed up against the door.

C.L., another reluctant witness who admitted having "too many" drinks, did not agree with the time sequence of other witnesses. He testified that, shortly before he and others left the house, the victim was "hysterical" in the bedroom and he "tried to comfort her." He also recalled appellant, in the car, said, "I got some." After attempts at refreshing his recollection as to more of appellant's statements in the car failed, the judge admitted as past recollection recorded C.L.'s prior sworn statement to the Air Force Office of Special Investigations (AFOSI) agent, "Bobby's words were, 'Man, we ran a train on [A.H.]'"

R.W., the victim's former boyfriend, testified as a defense witness on the issue of consent. He had been at the party. On Sunday afternoon he spoke with the victim on the telephone, and the subject of what happened to her the night before came up. The victim wanted to know if he "knew what happened and who it was," and he told her no. Then she said a friend had told her she could claim rape, "But, [R.W.], the bad thing about it is I don't know if I wanted it or not." R.W.'s testimony was contradicted by the victim, who denied saying anything about consent or lack thereof to him. The victim's sister also testified in rebuttal that she was sitting next to the victim during the telephone conversation, and the victim made no such statement.

During oral argument, counsel for appellant asked us to consider the legal as well as factual sufficiency of the evidence. We have done so. Having considered the facts in the light most favorable to the prosecution, we find sufficient evidence on each element to convict. *Jackson v. Virginia,*

443 U.S. 307, 309, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Moreover, we ourselves are convinced of appellant's guilt beyond a reasonable doubt. Article 66(c), U.C.M.J.; *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

### Failure to Give Accomplice Testimony Instruction

■ Appellant urges us to find plain error in the trial judge's failure, *sua sponte*, to give an accomplice testimony instruction concerning the testimony of C.L., M.R., and D.H. Appellant recognizes that, absent plain error, trial defense counsel's failure to request such an instruction would waive objection to its omission. R.C.M. 920(f); *United States v. Lee*, 6 M.J. 96 (C.M.A. 1978).

■ The term "accomplice" has been given a broad definition in military law, and includes persons who are "culpably involved in the crime with which accused was charged," regardless of whether they are subject to prosecution. *United States v. Scoles*, 14 U.S.C.M.A. 14, 33 C.M.R. 226, 231 (1963). Under the facts of this case, we find that C.L., M.R. and D.H. could have been considered to have been associated with appellant in the commission of attempted rape. Upon request, appellant was entitled at trial to an instruction on accomplice testimony allowing the court members to determine for themselves whether the witnesses were accomplices. *United States v. Gillette*, 35 M.J. 468, 470 (C.M.A.1992).

■ Our next question is whether it was plain error for the trial judge to fail to give such an accomplice testimony instruction, absent a request by the defense. Plain error will only be found where the accomplice testimony constitutes the sole evidence as to some of the elements or constitutes virtually the entire case for the prosecution. *Lee*, 6 M.J. at 97; *United States v. Sanders*, 34 M.J. 1086, 1092–3 (A.F.C.M.R.1992). The primary case against appellant rested on the testimony of J.W. and the victim. Moreover, the testimony of the accomplices, if so they were, was corroborated by this testimony.[2] We find no plain error.

### Exclusion of Defense Witnesses

■ Appellant claims prejudicial error when the trial judge refused to allow the defense to produce the testimony of two persons who had been at the party and were later interviewed by agents of AFOSI. Trial defense counsel proffered that the witnesses would "go further to establish a pattern by the OSI of unduly influencing witnesses, of attempting to steer the evidence in this case, failing to investigate proper leads that might have been exculpatory for the defense." Trial defense counsel argued the testimony was relevant "because this was an individual who was present at the scene, was a part of that same investigation, and that goes to show specifically a pattern on the part of the OSI which may tend to show that our impeachment of the other witnesses was valid." After assuring himself the two were not witnesses on the merits, the trial judge refused to allow the testimony, ruling that "methodology," presumably AFOSI methodology, was "not relevant and material to the credibility of the other witnesses."

The judge's ruling was entirely proper. The defense had elicited, on cross-examination of four witnesses, evidence that witnesses felt AFOSI techniques were coercive and singled out appellant to the exclusion of other suspects. Such evidence goes to the weight to be afforded those witnesses' testimony.[3] Trial defense counsel's attempt to bolster this credibility evidence

---

**2.** The testimony of the accomplices was also not entirely incriminating. In many significant respects, it tended to undermine appellant's culpability. Trial defense counsel ably walked a tightrope: he used accomplice testimony to point out conflicts with J.W.'s testimony and, at the same time, attacked it as contradictory and confused. Arguably, it was not to the defense's advantage to label any of the purported accomplices as such, because calling them "accomplices" would tend to highlight the evidence showing his client to be culpably involved in group sexual activity with the victim.

**3.** *United States v. McCoy*, 31 M.J. 323, 328 (C.M.A.1990).

was collateral and not material, as the trial judge ruled.

Rebuttal Testimony of Victim's Sister

■ At the conclusion of the defense case, trial counsel called the victim's sister to rebut the testimony of R.W. Appellant argues that the trial judge's failure to follow the witness sequestration rule of Mil. R.Evid. 615 was an abuse of discretion which prejudiced his right to a fair trial.

The sister had been in the courtroom during most of the trial and heard the evidence. Trial counsel advised the military judge the sister approached him during the previous recess and told him she was present when the victim spoke with R.W. on the telephone, and the victim did not make the remarks questioning whether she had consented to which R.W. testified. Trial counsel averred the sister was a surprise witness, and that the government had not planned any rebuttal to R.W.'s testimony until just moments before the court reconvened. The military judge declined to attribute "bad faith" to the prosecution. He allowed the sister's testimony, carefully limited not to permit hearsay.

■ We first note that we do not face a defense waiver, for, while neither party invoked the sequestration rule, the trial judge invoked it *sua sponte*, as permitted by Mil.R.Evid. 615. Nevertheless, the rule is not, as appellant has argued, an "exclusionary rule" of evidence, and it is within the trial judge's discretion to permit a witness to testify who has heard previous testimony.[4] *United States v. Croom*, 24 M.J. 373, 375 (C.M.A.1987); *United States v. Walker*, 613 F.2d 1349, 1354 (5th Cir. 1980). Prior military decisions have permitted expert witnesses [5] and criminal investigators,[6] to testify after observing all or a portion of the trial.[7] Even where a witness has knowingly violated a trial

court's sequestration order, the witness ordinarily should be allowed to testify, but the court may impose sanctions, such as informing the jury of the witness's actions, permitting cross-examination on the violation, and even considering contempt. *Holder v. United States*, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893).

■ Here we have no willful violation of the military judge's sequestration order, in that the victim's sister was not a known witness. The trial judge found the prosecution was not guilty of "bad faith," and we agree. The circumstances shown in the record of trial support the prosecutor's contention that the sister was truly a "surprise" witness. A sequestration order can only apply to a known witness. *United States v. Cortwright*, 528 F.2d 168, 176 (7th Cir.1975).

■ Military judges have wide latitude in controlling the presentation of rebuttal evidence. Mil.R.Evid. 611(a). The testimony of the sister was on a limited issue: whether the victim made a prior inconsistent statement about consent. The trial judge applied the balancing test of Mil. R.Evid. 403 and concluded that the probative value of her testimony outweighed the danger of confusion of the issues or misleading the members. We concur. The victim's consent or lack thereof was a critical element of proof. The victim testified she did not consent, but had practically no recall of the events, and did not make an official complaint until four days later. R.W. testified the victim questioned, on the day after the events, whether she may have consented. Under these facts, the trial judge could properly find, as he did, the sister's testimony that the victim did not make a prior inconsistent statement was relevant to rebut a claim of recent

4. Indeed, Mil.R.Evid. 615 itself provides for three exceptions: the accused; designated "representatives" of the U.S.; and "persons whose presence is shown by a party to be essential to the presentation of the party's case."

5. *United States v. Croom, supra.*

6. *United States v. Scott*, 13 M.J. 874, 877 (N.M.C.M.R.1982)

7. But the trial judge may require the witness to testify out of order to prevent contamination of the testimony. *See generally, In re United States*, 584 F.2d 666 (5th Cir.1978). *Accord* S. Saltzburg, L. Schinasi, and D. Schleuter, *Military Rules of Evidence Manual*, 714 (3d ed. 1991).

fabrication and was not collateral. In addition, the trial judge carefully limited the sister's testimony to the fact that she did not hear the purported remarks by the victim. He did not permit the witness to testify as to any of the telephone conversation she may have overheard. The defense was given latitude to explore possible bias and motive to fabricate during cross-examination. Under these facts, the judge did not err in allowing this testimony.

We have considered the remaining assignments of error and find them without merit. Upon examination of the entire record, the findings and sentence are correct in law and fact. Accordingly, the findings and sentence, as approved, are

AFFIRMED.

Chief Judge DIXON and Senior Judge McLAUTHLIN concur.