**UNITED STATES, Appellee,**

v.

**Charles F. ROTH, Specialist, U.S. Army, Appellant.**

No. 98–0270.

Crim.App. No. 9600441.

U.S. Court of Appeals for the Armed Forces.

Argued Dec. 2, 1998.

Decided Sept. 30, 1999.

COX, C.J., delivered the opinion of the Court, in which SULLIVAN and EFFRON, JJ., joined. SULLIVAN, J., filed a concurring opinion. GIERKE, J., filed a dissenting opinion, in which CRAWFORD, J., joined.

For Appellant: *Captain Donald P. Chisholm* (argued); *Colonel John T. Phelps II, Lieutenant Colonel Adele H. Odegard,* and *Captain Paul Fiorino* (on brief); *Lieutenant Colonel Michael L. Walters* and *Major Holly S.G. Coffey.*

For Appellee: *Major Patricia A. Ham* (argued); *Colonel Russell S. Estey* (on brief); *Lieutenant Colonel Eugene R. Milhizer* and *Captain Chris A. Wendelbo.*

Chief Judge COX delivered the opinion of the Court.

In this case, we are called upon to decide if the "military judge abused her discretion by refusing to allow appellant to offer a sentencing witness in rebuttal" to the Government's

evidence in aggravation.[1] We conclude that she did, and we reverse.

Appellant and some accomplices broke into his unit supply room located in the headquarters building at Fort Lewis, Washington. They stole 11 pairs of night vision goggles and some computer equipment. When the theft was discovered, the unit went into lockdown for a month. A high priority investigation took place targeting every member of the unit, but it was unsuccessful. About 5 weeks after the theft, the investigators got a tip that night vision goggles, which had come from the Army, were in circulation in California. The investigators tied the goggles to appellant.

Appellant had given the night vision goggles and computer equipment to some childhood friends to sell for him. Ultimately, all of the stolen items were recovered.

At a general court-martial composed of officer members, appellant pleaded guilty to wrongful disposition of military property (2 specifications), in violation of Article 108, UCMJ, 10 USC § 908. Contrary to his pleas, he was convicted of conspiracy to sell, larceny of, and attempted sale of military property, in violation of Articles 81, 121, and 80, UCMJ, 10 USC §§ 881, 921, and 880, respectively. He was sentenced to confinement for 16 years, total forfeitures, reduction to Private E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged. The Court of Criminal Appeals affirmed the findings and sentence on October 20, 1997.

### THE MILITARY JUDGE'S RULING

During the Government's case on sentencing, Special Agent Barnes, an Army Criminal Investigation Command (CID) agent, testified without defense objection that the theft of night vision goggles was a very serious offense because the goggles might "fall into the wrong hands." He went on to explain that the "wrong hands" included drug traffickers and gangs. Again, there was no ob-

jection. These were the only two comments by the government witness as to gangs.

Not content to leave this theme alone, defense counsel, on cross-examination, sought to explore the question of whether Special Agent Barnes was suggesting by his testimony that appellant was a gang member. The following ensued:

Q: Now, you've thrown around the word "gang" a lot, and I think Major Martin's brought it out that you belong to about every—you've been—you have a lot of experience in investigating gang activity, isn't that correct?

A: Yes, sir.

Q: Isn't it true that your investigation revealed that Specialist Roth was not a member of any kind of gang, was he?

A: No, sir, it did reveal that.

* * *

Q: Agent Barnes, Specialist Roth was not a member of a gang involved in criminal activity that you were able to discern, isn't that true?

A: I did discern that.

Q: That this was a gang involved in criminal activity?

A: By their self-admission.

Q: Agent Barnes, if Mr. Rosario, who is in charge of the Leahy Housing Area and has been there for 5 years, were to come up here and testify that there is no gang activity at Leahy, from his 5 years of observation and from his law enforcement background, could you be mistaken?

A: No, the Leahy Way housing authorities do not believe there is a "Leahy Way Street Posse" and they do not believe that there is a "Village Crew." That is true, the Leahy Way person would tell you that there is no gang.

---

1. The granted issue is:
   WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION BY REFUSING TO ALLOW APPELLANT TO OFFER A SEN-
   TENCING WITNESS IN REBUTTAL TO THE GOVERNMENT'S INFERENCE THAT APPELLANT STOLE NIGHT VISION GOGGLES FOR USE BY A STREET GANG.

Following defense counsel's cross-examination, trial counsel elicited more information from Special Agent Barnes, including the fact that appellant was a member of a gang called the "West Coast Criminals," and he also testified that appellant attempted to sell some of the goggles to members of "The Village Crew." There was no defense objection to this testimony, and trial counsel used it in his closing argument.

When it became appellant's turn to present his sentencing case, defense counsel called Mr. Rosario to testify. Mr. Rosario was the manager of the Leahy Way housing area. He had been brought to Fort Lewis from Livermore, California, as a defense witness. His expected testimony was to contradict the testimony of Special Agent Barnes regarding gang activity at the Leahy Way housing area.

Trial counsel entered an immediate objection to the witness, claiming "he's been seated in the courtroom this entire time," referencing the testimony of Special Agent Barnes. The following exchange then took place between the military judge and counsel in an out-of-court session:

MJ: Captain Bell, explain to me why you're calling a witness out of the spectator section who hasn't been sequestered, who is not a family member?

DC: I'd be glad to, Your Honor. Prior to this court-martial beginning, I submitted a witness request list to Major Martin. On that list I put Mr. Rosario and he asked, "Why would you be calling this individual?" And I said, "Because I'm afraid that the Government is going to present some evidence about gang activity, which was clearly not borne out by the investigation, and—"

MJ: Explain to me why you have a witness who has not been sequestered?

DC: Because I was mislead by the Government, Your Honor. I was told affirmatively by Major Martin that he would present no evidence whatsoever on gang activity. I relied on his assertion and I did not think Mr.— I had no intention whatsoever

of calling Mr. Rosario until Major Martin started hammering this so called "Leahy Gang," when I was informed that he would not do that.

MJ: Captain Bell, you brought this up on cross-examination. You set this up. You are not going to call this witness. That is my sanction.

DC: On the record, I object, I was mislead by the Government—

MJ: The record is clear as to who raised this issue. You will not call your witness.

DC: Your Honor, may I ask how I raised this issue when it was brought out on direct—

MJ: You did it on cross-examination. You're the one that initially broached the subject of gang activity and Specialist Roth. It was not raised by the Government.

DC: Your Honor, the Government went into great detail about Special Agent Barnes' gang knowledge. They went on direct examination talking about Special—Special Agent Barnes' gang education.

MJ: Captain Bell, if you will—if you review the testimony afterwards, you will see that the Government kept this in general terms and in no way related this to Specialist Roth or Livermore, California. They said that the reason for the investigation was so that these night vision goggles would not fall into the wrong hands. There was absolutely no tie-in with Specialist Roth. You brought this up yourself initially on cross-examination. At that time, you should have stopped, you should have had your witness leave the courtroom. You had that witness sitting through his entire testimony. The sanction is: You will not call this witness.

*THE LAW*

Mil.R.Evid. 615, Manual for Courts–Martial, United States (1995 edition), provides the following on the exclusion of witnesses:

At the request of the prosecution or defense the military judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and the military judge may make the order *sua sponte.*

The rule is silent as to sanctions if a party or a witness violates the rule. However, a noted treatise on the subject indicates the following regarding sanctions for violations of the rule:

However, no effective remedies for treating violations of a sequestration order have been developed, particularly where counsel cannot articulate specific harm. . . .

Other remedies are available, though. The bench should permit counsel to bring out and comment on the sequestration violation. Certainly, it relates to witness credibility. The court could add its own comment on the violation. The bench could also prohibit a witness from testifying or strike his testimony. This remedy has not been widely used since it deprives a party and the fact-finder of testimony that might be critical to a fair decision. Since courts have been reluctant to embrace this remedy, it is not surprising that even harsher remedies—like dismissing a case or striking a defense—have not been popular.

S. Saltzburg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual,* 825 (4th ed.1997) (footnotes omitted).

Violations of the sequestration rule have been treated generally in three ways. *See Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893); *United States v. Lattimore,* 902 F.2d 902 (11th Cir.1990). First, the witness (or counsel) may be cited for contempt or other appropriate admonitions or reprimands. *See* RCM 801(b) and 809, Manual, *supra;* Art. 48, UCMJ, 10 USC § 848. Second, the court may allow opposing counsel to cross-examine the witness as to the nature of the violation; and third, where counsel or the witness violates the rule intentionally, the court may strike testimony already given or disallow further testimony.

Our research reveals that the sanction of excluding the witness has been used sparing-ly, particularly where a government witness has not been sequestered. *United States v. Gittens,* 36 MJ 594 (AFCMR 1992); *United States v. Lattimore, supra; United States v. Womack,* 654 F.2d 1034 (5th Cir.1981). Indeed, most of the cases concern the issue that the judge did not exclude the witness.

■ As with other evidentiary rulings, "[s]equestration of witnesses and sanctions for violations of a sequestration order are matters within the discretion of the court." *United States v. Oropeza,* 564 F.2d 316, 326 (9th Cir.1977).

■ The standard of review for these rulings is an "abuse of discretion." *United States v. English,* 92 F.3d 909, 913 (9th Cir. 1996); *United States v. Avila–Macias,* 577 F.2d 1384, 1389 (9th Cir.1978).

### CONCLUSION

■ We conclude that the military judge abused her discretion by excluding Mr. Rosario as a defense witness in the sentencing portion of the trial. First, RCM 1001(c)(3) provides:

(3) *Rules of evidence relaxed.* The military judge may, with respect to matters in extenuation or mitigation or both, relax the rules of evidence[.]

■ While this rule goes on to discuss the admission of documentary evidence, it is not limited to documentary evidence. If read in conjunction with the rules on production of witnesses in sentencing found in RCM 1001(e), it is clear that the intent of the sentencing rules is to favor the admission of relevant evidence in the sentencing proceeding, regardless of the form of the evidence. Mil.R.Evid. 615 is a rule of evidence. The military judge had the discretion to "relax" the rule during this proceeding.

The witness, Mr. Rosario, traveled a considerable distance to be with appellant as a witness in his case. Neither Mr. Rosario, appellant, nor the community in which he lived will understand the harsh sanction imposed upon him by the military judge. They will always believe, rightly or wrongly, that the unrebutted evidence that appellant was a member of a gang, in part, caused the impo-

sition of 16 years' confinement upon appellant. This was a significant piece of evidence that Mr. Rosario apparently was prepared to dispute.

We agree with the Government's argument in this case that defense counsel "invited" this situation. First, appellant opened the door to the question of his membership in gangs and his participation in gang activities. The agent had testified on direct examination that he was a member of several gang investigative associations and had published papers on gangs and the military. He also testified, as mentioned earlier, that the investigation into the missing goggles was given a high priority because of fear they would fall into the "wrong hands," including gangs. None of this, however, suggested any direct involvement of appellant in gangs or gang activities.

Second, counsel did not ask Mr. Rosario to leave the room during his examination of the agent. However, there is nothing in the record to suggest that defense counsel's conduct was deliberate or willful, or done with the design to coach his witness.

■ Third, the ultimate sanction of excluding the witness should be used ordinarily to punish intentional or willful disobedience of the military judge's sequestration orders. *Lattimore, supra* at 904; *United States v. Blasco,* 702 F.2d 1315, 1327 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). As with other rules that may preclude a defendant from introducing important defense evidence, neither the rule nor the enforcement of the rule can be "disproportionate to the purposes they are designed to serve." citing *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Michigan v. Lucas,* 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991).

Fourth, the Government would not have been prejudiced if the witness had been allowed to testify. Special Agent Barnes had already acknowledged that the people from the Leahy Housing Area would testify that there were no gangs there, a fact that Special Agent Barnes disputed. Thus, the witness was not offering surprise testimony. Furthermore, there is no indication that the presence of the witness in the courtroom would have caused him to tailor his testimony to the evidence.

Last, the issue of whether or not the night vision goggles were stolen by, and intended for the use of, street gangs became an important issue in sentencing, albeit, because of defense counsel's cross-examination of Special Agent Barnes. It was fundamentally unfair to leave this evidence totally unrebutted.

Accordingly, under these circumstances, we hold that the military judge abused her discretion in excluding the testimony of the defense witness, Mr. Rosario. *See also Michigan v. Lucas, supra.*

The decision of the United States Army Court of Criminal Appeals is reversed as to sentence. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on sentence may be ordered.

SULLIVAN, Judge (concurring):

I agree that appellant's sentence must be reversed and remanded. However, I would hold that the Government did initially approach the gang connection on direct examination. I do not find Special Agent Barnes' description of his gang-related education innocuous; rather it opened the door for speculation that appellant's activities were gang related.

I would further find that the military judge did abuse her discretion by imposing the "death penalty" of sequestration sanctions without justification. The record shows only a general sequestration order without specifically mentioning Rosario. Assuming the order was violated, the extreme sanction bears no relationship to the violation. The Supreme Court in *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), held that a judge may not take the extreme measure of excluding a witness which disproportionately punishes the party which violates a rule of evidence. Such actions are unjustified restrictions on a criminal defendant's rights to confront adverse witnesses and present evidence. In appellant's case,

Special Agent Barnes testified to appellant's gang involvement to the fullest without any opportunity of rebuttal by the defense. This presented a lethal blow to the defense sentencing case and requires reversal of his sentence.

GIERKE, Judge, with whom CRAWFORD, Judge, joins (dissenting):

In my view, the military judge did not abuse her discretion by enforcing Mil.R.Evid. 615.

At the outset, I disagree with the majority's implication that the Supreme Court's decision in *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), supports its decision. In *Lucas,* the trial court had excluded evidence of the victim's past sexual conduct because the defense had failed to give the notice required by the state's "rape-shield" statute. The Michigan Court of Appeals held that the notice-and-hearing requirement in the state's "rape-shield" statute was unconstitutional. The Supreme Court overturned the Michigan court's decision. It explained:

> The sole question presented for our review is whether the legitimate interests served by a notice requirement can ever justify precluding evidence of a prior sexual relationship between a rape victim and a criminal defendant. The answer from the Michigan Court of Appeals was no; it adopted a per se rule prohibiting preclusion of this kind of evidence. This ruling cannot be squared with our cases.

500 U.S. at 151, 111 S.Ct. 1743.

In its opinion, the Supreme Court recognized the authority of a trial judge to exclude a witness as a sanction for violating a notice requirement. It reviewed several cases where the exclusion of a defense witness was upheld. *Id.* at 149–52, 111 S.Ct. 1743. The Supreme Court "express[ed] no opinion as to whether or not preclusion was justified in this case." *Id.* at 153, 111 S.Ct. 1743.

In my view, the military judge's decision in the case before us was justified, for the following reasons:

First, the primary issue on sentencing was the sensitive nature of the night vision goggles and the danger of their falling into the "wrong hands." *See* RCM 1001(b)(4) (permitting evidence of "aggravating circumstances directly relating to or resulting from the offenses"). Whether appellant was a member of a gang was a secondary, collateral issue.

Second, the defense first raised the issue of appellant's connection with gangs during cross-examination of Special Agent (SA) Barnes.

Third, the defense elicited testimony from SA Barnes that the Leahy Housing Area manager did not believe that there were gangs in the housing area. Thus, Mr. Rosario's testimony would have merely repeated the point already acknowledged by SA Barnes: that Mr. Rosario did not believe that there were gangs in the housing area.

Fourth, the defense improperly permitted Mr. Rosario to remain in the courtroom while they questioned SA Barnes about what Mr. Rosario would say.

Fifth, the military judge was consistent and even-handed in excluding Mr. Rosario. The military judge previously had sanctioned the prosecution by excluding a prosecution witness who was not sequestered. Knowing that the military judge had previously sanctioned the prosecution by excluding a prosecution witness who was not sequestered, the defense nevertheless jeopardized its ability to present the testimony of Mr. Rosario by not sequestering him.

Finally, if there was any error in this case, it was harmless. As noted above, Mr. Rosario would have merely repeated the point already made by SA Barnes regarding a collateral issue. In my view, it was appellant's abuse of trust and the sensitive nature of the stolen property, not the oblique references to appellant's supposed gang membership, that caused the court-martial to sentence him to a punitive discharge and a lengthy period of confinement.